913 So.2d 452 (2005)
S.B.U.
v.
D.G.B.
2031054.
Court of Civil Appeals of Alabama.
May 13, 2005.
*453 Bart Harmon and Hope Curtis of Webb & Eley, P.C., Montgomery; and Glenn Carlyle Noe, Sulligent, for appellant.
Jerry Guyton of Fite, Davis, Atkinson, Guyton & Burt, P.C., Hamilton, for appellee.
MURDOCK, Judge.
S.B.U., the father, appeals from a judgment of the Marion Juvenile Court returning custody of his daughter to D.G.B., the mother.
The parties married in July 1997. Their daughter was born in January 1998. The parties were divorced in May 2000. Apparently pursuant to the divorce judgment, which was based on an agreement of the parties, the parties were awarded "joint custody" of their daughter, but the mother was "named the custodial parent" and the father was awarded visitation.[1]
In mid-December 2003, the mother's sisters took the daughter from the mother's home and carried her to the hospital where the child was diagnosed with pneumonia. When the sisters took the daughter to the hospital, they apparently indicated that the mother had been using drugs and a report was made to the Marion County Department of Human Resources ("DHR").[2] After receiving the report, Shane Harris, a DHR caseworker, informed the mother and her husband that he wanted to administer a drug screen. However, the mother and her husband admitted that they would test positive for methamphetamine if they submitted to the drug screen. Harris then informed the mother that she had two options: (1) she could voluntarily give custody of the daughter to an acceptable relative and DHR would not involve itself any further or (2) DHR could "open a case" on her and provide her with services. The mother informed Harris that she did not want to be involved with DHR and that she would give custody of the daughter to the daughter's maternal grandmother.
*454 According to Harris, after the mother agreed to give custody of the daughter to the maternal grandmother, he believed that DHR "was kind of out of it from there." Soon after Harris's discussion with the mother, however, the father was informed that his daughter was in the hospital and he was apparently informed about Harris's discussion with the mother. The father went to Harris's office and informed Harris that he wanted custody of the daughter. Harris performed a background check on the father that confirmed that DHR had no adverse reports about him. Harris then informed the father that he should contact an attorney to assist him with obtaining custody. Thereafter, the father, the mother, and the maternal grandmother met with an attorney retained by the father.[3]
The attorney assisted the father and the mother with the preparation of a "Petition for Temporary Order" that was executed by the father and a "Consent to Temporary Order" that was executed by the mother. The petition and the consent were filed in the Marion Juvenile Court on December 22, 2003. In the petition, the father alleged that he was the biological father of the daughter and that the mother was the daughter's "custodial parent." The father also alleged that "[a]ll parties are in agreement that it will be in the best interest of [the daughter] that her biological father ... be granted temporary custody of said child until further order of this Court." Further, the father alleged that "the biological mother ..., due to circumstances, is unable to care for the child." The father requested that the juvenile court award him "temporary custody of his biological child until further order of this Court." The mother's consent stated: "I, the undersigned ... do hereby agree and consent for the temporary care, custody, and control of the above named child be granted to her father, [S.B.U.]."
Also on December 22, 2003, the juvenile court entered a "Temporary Order" that stated:
"Based upon the petition filed by the [father] and the [s]ame having been duly considered, it is
"ORDERED, ADJUDGED AND DECREED BY THE COURT AS FOLLOWS:
"1. That the temporary care, custody and control of [the daughter] be and the same is hereby granted to [the father] until further order of this Court.
"2. That the mother of said child ... be granted reasonable, supervised, visitation rights, at the discretion of the father."
After the temporary order was entered, the mother contacted Harris to discuss the possibility of her regaining custody of the daughter. Harris informed the mother that DHR was no longer involved in the matter and that she should hire an attorney to petition the court for custody.
In May 2004, the mother filed a "Motion for Custody" in the juvenile court, alleging that, after DHR had confronted her and *455 her husband in December 2003, she had executed "an agreement granting temporary custody of" the daughter to the father. The mother alleged that she and her husband had not "used any drugs" since December 2003, that DHR was "not now involved in this matter," and that it would be in the daughter's best interest to be in the mother's custody on both a "temporary" and a "permanent" basis.
The father filed an answer denying that the mother should have custody of the daughter. The father also filed a "Counterclaim," alleging that a "material change of circumstances" had occurred since the entry of the juvenile court's December 2003 order awarding him "temporary custody." He requested that the juvenile court "[m]odify the Order heretofore rendered in this cause by awarding to [the father] the care, custody and control of the minor child of the parties."
After an ore tenus proceeding, the juvenile court entered a judgment in August 2004. In the judgment, the juvenile court awarded the mother custody of the daughter based on its finding that such was "in the child's best interest and that the benefit to the child will outweigh the inherent disruptiveness." The juvenile court awarded the father visitation.
The father appeals. He contends that the juvenile court "erred as a matter of law in ordering removal of custody from [him] absent any evidence of his unfitness or evidence that the transfer would `materially promote' the child's welfare." The father also contends that the mother did not offer sufficient evidence to satisfy the burden of proof prescribed by Ex parte McLendon, 455 So.2d 863 (Ala.1984), which the father contends was the applicable burden of proof. However, because we conclude that the juvenile court lacked subject-matter jurisdiction to address the mother's "Motion for Custody" and the father's "Counterclaim," we need not address the merits of the father's contentions.
It is well settled that "subject-matter jurisdiction may not be waived; a court's lack of subject-matter jurisdiction may be raised at any time by any party and may even be raised by a court ex mero motu." C.J.L. v. M.W.B., 868 So.2d 451, 453 (Ala.Civ.App.2003); see, e.g., Ex parte Norfolk S. Ry. Co., 816 So.2d 469, 472 (Ala.2001) ("We are obliged to recognize an absence of subject-matter jurisdiction obvious from a record, petition, or exhibits to a petition before us."). A judgment entered by a court that lacks subject-matter jurisdiction is void. See C.J.L., 868 So.2d at 454; see also J.B. v. A.B., 888 So.2d 528 (Ala.Civ.App.2004).
The juvenile court is a court of limited jurisdiction. See § 12-15-30, Ala.Code 1975; J.D.R. v. M.M.E., 898 So.2d 783 (Ala.Civ.App.2004). Although a juvenile court has jurisdiction to determine custody when a "child is otherwise before the court," Ala.Code 1975, § 12-15-30(b)(1), i.e., when the juvenile court has an independent basis for jurisdiction, the juvenile court does not otherwise have jurisdiction over custody disputes between divorced parents absent allegations that emergency circumstances exist that threaten a child's welfare or allegations that a child is dependent. See Ex parte K.S.G., 645 So.2d 297 (Ala.Civ.App.1992); see also P.R.G. v. W.P.R., 590 So.2d 913, 914 (Ala.Civ.App.1991) ("once a circuit court has acquired jurisdiction over a child pursuant to a divorce and decides the question of custody, that court retains jurisdiction over custody until the child reaches majority"). Compare Carter v. Jefferson County Dep't of Pensions & Sec., 496 So.2d 66 (Ala.Civ.App.1986) (holding that a juvenile court had jurisdiction to decide custody despite a previous custody *456 award in a divorce proceeding because the case was not a custody dispute between the parents; instead, DHR had filed a dependency petition).
After carefully reviewing the record, we conclude that no basis existed for the juvenile court to exercise jurisdiction over the mother's "Motion for Custody" or the father's "Counterclaim."[4] None of the pleadings contained allegations that the daughter was a dependent child or that any emergency circumstances existed concerning the daughter's custody; nor was DHR made a party to the proceedings. Likewise, no argument was made at trial that the daughter was a dependent child or that any emergency circumstances existed that might require a custody order from the juvenile court. Instead, this cause involved a custody dispute between two divorced parents who had apparently initially agreed to a custody arrangement as part of a divorce judgment and who subsequently agreed to temporarily change that arrangement to prevent the State, through DHR, from becoming formally involved in decisions regarding the custody of their child.
Accordingly, the August 2004 judgment is void and it will not support an appeal. Carter v. Hilliard, 838 So.2d 1062, 1064 (Ala.Civ.App.2002). We therefore dismiss the father's appeal and direct the juvenile court to set aside its August 2004 judgment.
APPEAL DISMISSED WITH INSTRUCTIONS TO THE JUVENILE COURT.
PITTMAN and BRYAN, JJ., concur.
CRAWLEY, P.J., and THOMPSON, J., concur specially, with writings.
CRAWLEY, Presiding Judge, concurring specially.
I write specially to address the concerns raised by Judge Thompson in his special concurrence. Although the policy of allowing a parent the alternative of voluntarily transferring custody to a relative rather than involving the Department of Human Resources ("DHR") when that parent's parenting ability has been called into question might be reason for concern, I do not believe it is the place of this court to address that problem.
The legislature charges DHR to:
"(10) Seek out, through investigation, complaints from citizens, or otherwise, the minor children of the state who are in need of its care and protection and shall, as far as may be possible, through existing agencies, public and private, or through such other resources, aid such children to a fair opportunity in life."
Ala.Code 1975, § 38-2-6(10). If, as Judge Thompson states, it is "easily foreseeable that a parent faced with the option provided by DHR's policy could conspire with family members to fake a custody transfer to avoid DHR involvement, or that a child could be returned to an unsuitable parent by a relative who is unwilling or unable to continue to care for the child," 913 So.2d at 459 (Thompson, J., concurring specially), then surely the legislature considered that possibility. Additionally, the policy in question has not been challenged before this court. We should defer to the interpretation that DHR, a part of the executive branch, has given its own policy.
THOMPSON, Judge, concurring specially.
The policy and practices implemented by the Department of Human Resources *457 ("DHR") in handling this case and other similar cases raises great concerns. According to the record, DHR's training policies instruct DHR social workers to give a parent whose parenting ability has been called into question by a complaint or investigation the alternative of avoiding DHR supervision altogether by allowing that parent to transfer, or purport to transfer, custody of his or her child to another relative; once the parent agrees to such a transfer, unless or until another complaint is lodged, DHR does not involve itself further in monitoring the welfare of the child or children involved. As the juvenile court noted, that practice seems to be "a hole in the whole system." The concern, obviously, is for the welfare of the children who might, and eventually will, fall through that hole in the system.
DHR received two complaints within two months regarding the mother's and her husband's possible drug use. During the first investigation, the mother denied using illegal drugs, and DHR did not require her to take a drug-screen test. At the time the DHR social worker investigated the second complaint, the child at issue in this appeal was in the hospital being treated for pneumonia; the child's aunts, rather than her mother, had taken the child and the child's half sister (hereinafter together referred to as "the children") for medical treatment at that time. At the hospital, both the mother and her husband admitted that they had recently used methamphetamine. However, rather than take the children into protective custody or open a protective-case file in order to monitor the children, the DHR social worker negotiated with the mother, an admitted drug user, regarding the transfer of custody of the children to one of the mother's relatives. The DHR social worker testified as follows:
"So at that point in time, I told them, I said, `Well, you have a choice.' I said, `Since you have admitted to me that you have used [methamphetamine],' I said, `we can  you can let the children stay with a relative, keep custody, DHR open a case, or if you do not want to work with DHR, then you can sign custody over to someone, and DHR will not open a case.' And so at that time, [the mother and her husband]  of course, they talked about it for a while, and then they decided they would sign custody over to [the maternal grandmother, E.G.], and I was kind of out of it from there. Then [the father] came forward, and custody [of the child] was signed from [the mother] over to [the father], him being the father, and then [the half sister], I think, went with [E.G.]."
The DHR social worker indicated that had the mother not agreed to transfer custody of the children to their maternal grandmother, E.G., DHR would have removed the children from the mother's home; the record does not indicate why the mother and DHR did not initially arrange for the child to be placed with her father. However, the DHR social worker testified that after the mother agreed to transfer custody of the children to the maternal grandmother, DHR was no longer considered to be involved in the matter.
"[FATHER'S ATTORNEY]: Did you have any reason to continue an open case file on those children?
"[DHR SOCIAL WORKER]: No. We did not open a case due to the fact that there was an agreement to sign custody over.
"[FATHER'S ATTORNEY]: Did you not open a case also because [the mother and her husband] had indicated that they did not want to work with [DHR]?
"[DHR SOCIAL WORKER]: Right. When they were relieved of custody, then, you know, we did not open a case. *458 We would have placed the children no matter what. The children were going to leave the home that day regardless, and so, of course, we give everybody an option...."
By stating that the children "were going to leave the home that day regardless" of whether the mother agreed to transfer custody to a relative, the DHR social worker clearly indicated that he believed that the children's situation warranted the filing of a petition alleging that the children were dependent. See § 12-15-52, Ala.Code 1975. Thus, although DHR clearly considered the situation serious enough to warrant the removal of the children from the mother's custody, it did not monitor that situation, even by simply opening a case file, to ensure the safety of the children. The DHR social worker testified that he did not open a case file because the mother agreed to transfer custody of the children to E.G.; the record does not clearly indicate that DHR even verified that the custody of the children was transferred to E.G. or that the children actually went to live with and were cared for by either E.G. or the father. It is clear that DHR did not ensure that E.G. would not immediately return the child's half sister to the mother or that the children would be safe if they were returned to the mother by their custodians. In fact, E.G. did return the half sister to live with the mother soon after the purported transfer of custody, and the DHR social worker had no knowledge of that fact until the hearing in this matter.
The record indicates that had DHR opened a case file or taken the children into protective custody, the children still would have been placed with E.G. or the father.[5] However, under those circumstances, DHR or a court (if the child or children were determined to be dependent) would have been in a position to monitor the family and the children to ensure that the return of the children to the mother was safe and appropriate.
The juvenile court expressed its concerns regarding DHR's policy in the following exchange:
"THE COURT: Are you saying basically the training that you all receive now is to kind of almost immediately put folks in the position of having to choose whether DHR petitions the Court for custody, and then you make a placement as you deem appropriate, or that they kind of pick somebody that maybe has your endorsement and go get a private attorney and do it that method, and you technically stay out of it?
"[DHR SOCIAL WORKER]: Yeah. What they are  the way the policy is now is that they  like if we go and we find something to be true, somebody admits to using drugs, then what we do at that time is, you know, we tell them, `Okay. This is what is going to take place. These are your options.' If we have to take custody, then we let the parents decide. You know, if they have a suitable relative, we let the parents *459 make the decision for their children of where the child will go.
"THE COURT: Was it ever discussed that maybe that defeats the spirit at least of the RC[[6]] decisions?
"[DHR SOCIAL WORKER]: Well, if they decide not to do that, then  you know, let's say that we take custody, we petition and we get custody. Then we will work doing [individualized service plans] with them while the child is living with the other relative. Now, if they decide they do not want to work with DHR at all, then they can sign custody over.
"THE COURT: I am saying that is my point, though. If these folks went the other direction, said, `No, we are not going to voluntarily relinquish our custody. You go see the judge and see what happens,' then you would have had to basically furnish them services, maybe 
"[DHR SOCIAL WORKER]: Right.
"THE COURT:  drug testing? So I am just saying is it ever talked about in these training sessions we are kind of making an end run around here, the spirit of RC, the 
"[DHR SOCIAL WORKER]: That is my opinion on it, too. One part of RC says that they want the parents to make a decision, you know, based on whether they want to work and then  or what, you know, and then they turn around and say, `Well, you know, we work with families. We provide these services.' Had it been that [the mother] would have said no, you know, the children would have  we would have still petitioned to have the children removed or an agreement with them [sic], then they would have worked with DHR, done an ISP, opened a case, assigned an ongoing worker and had to go through the counseling and programs and everything like that from that aspect. And then, of course, it would have come back 
"THE COURT: Let me just  I do not think this is really hypothetical. [The mother and her husband] have turned in a drug test ... dated [February 5, 2004], which would be six weeks after the children were removed, that seems to indicate that the [mother and her husband] passed and apparently [E.G.], at least partially, returned [the child's half sister] to [the mother and her husband]. So is that something that soon  they had been through no rehab, no treatment, no classes, no nothing, and 
"[DHR SOCIAL WORKER]: See, that is something I was not aware of.
"THE COURT: I am just saying that seems like just a hole in the whole system, so to speak."
The legislature has set forth a number of duties and responsibilities of DHR. Among those responsibilities is the requirement that DHR:
"(10) Seek out, through investigation, complaints from citizens, or otherwise, the minor children in the state who are in need of its care and protection and shall, as far as may be possible, through existing agencies, public or private, or through such other resources, aid such children to a fair opportunity in life."
§ 38-2-6(10), Ala.Code 1975. I believe that it is easily foreseeable that a parent faced with the option provided by DHR's policy could conspire with family members to fake a custody transfer to avoid DHR involvement, or that a child could be returned to an unsuitable parent by a relative who is unwilling or unable to continue to care for the child.
*460 It is clear that current State-wide financial constraints have left DHR, like other State agencies, underfunded. According to the DHR social worker, the DHR policy of providing parents the option of avoiding DHR monitoring of their possibly dependent children seems to be based, at least in part, on a desire to reduce DHR's caseload.[7] However, the very purpose of DHR  to protect dependent children  is defeated if its policies and practices provide parents of dependent children a method by which they can (and will) attempt to bypass the monitoring and supervision intended to protect their children.
NOTES
[1] A copy of the divorce judgment is not contained in the record.
[2] In the fall of 2003, DHR had also investigated reports that the mother and her husband were engaged in the manufacturing of methamphetamine.
[3] We note the strong custodial presumption afforded by our law to natural parents, see, e.g., Ex parte Terry, 494 So.2d 628 (Ala.1986), and the fact that the actual custodial transfer eventually accomplished in this case was to the father. DHR had no information indicating that either the child's maternal grandmother or the child's father, who we also note had visitation rights with the child pursuant to the parties' 2000 divorce judgment, would be unfit custodians for the child. DHR and Harris apparently made an evaluation, which is DHR's administrative responsibility in the first instance, that under the circumstances the child was not one who needed the "care and protection" of the State acting through DHR. See § 38-2-6(10), Ala.Code 1975; see also § 12-15-1(10)(n), Ala.Code 1975 (defining "dependent child" as one who needs the "care and supervision" of the State).
[4] Based on our review of the record, it does not appear that a basis for jurisdiction existed when the father filed his "Petition for Temporary Order" either. However, whether the juvenile court had jurisdiction to consider the father's petition for temporary order and to enter the resulting order is not directly before us in this appeal.
[5] With regard to the placement of the children had the mother agreed to work with DHR, the DHR social worker testified as follows:

"[MOTHER'S ATTORNEY]: And you say that you gave [the mother] a choice there that she could either give up custody or work with DHR?
"[DHR SOCIAL WORKER]: Yes.
"[MOTHER'S ATTORNEY]: If [the mother] had worked with DHR, where would you have placed the children?
"....
"[DHR SOCIAL WORKER]: If [the mother] had worked with DHR, an ongoing worker would have been assigned, and it would have been  well, the same thing as what we did...."
(Emphasis added.)
[6] R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997).
[7] The DHR social worker explained DHR's policy as follows:

"Q: Is this a policy that DHR is following now that if a person  when you find these situations that if these persons will go and get a private attorney, then [DHR does not] open a file? Is that 
"[DHR SOCIAL WORKER]: According to DHR policy  of course, it has been revised, and according to the policy now, you know, whoever is the custodial parent, if custody is not with the parent  in other words, if the children are not in the home and custody is relieved, then according to our code, we 
"Q: You are not in it?
"[DHR SOCIAL WORKER]: Right. We do not open a case.
"Q: Okay. It also cuts down on the caseload, too?
"[DHR SOCIAL WORKER]: I think that is the reason for it, to be honest with you."